# Exhibit A
## (Collective)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

===================================================

TYLER MILLER,

     Plaintiff,

vs.                   CASE NO. 3:20-cv-00313

BRIGHTSTAR INTERNATIONAL CORP.
d/b/a BRIGHTSTAR CORP.,

     Defendant.

===================================================

VIDEOCONFERENCE DEPOSITION OF

TYLER MILLER

Taken on Behalf of the Defendant

December 22, 2020

_____

Reported by:
Terri Beckham, RPR, RMR, CRR
Tennessee LCR No. 355
Expires: 6/30/2022

1

```
1    APPEARANCES

2
     For the Plaintiff:
3
             EUGENE N. BULSO, JR., ESQ.
4            NICHOLAS BULSO, ESQ.
             Leader, Bulso & Nolan, PLC
5            414 Union Street, Suite 1740
             Nashville, Tennessee 37219
6            615.780.4110
             gbulso@leaderbulso.com
7

8    For the Defendant:

9            FRANKIE N. SPERO, ESQ.
             Bradley Arant Boult Cummings, LLP
10           1600 Division Street, Suite 700
             Nashville, Tennessee 37203
11           615.252.2365
             fspero@bradley.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

```
 1                    I N D E X

 2                                          Page

 3  TYLER MILLER

 4  Examination by Mr. Spero ......................5

 5

 6                    EXHIBITS

 7                 Description              Page

 8
    Exhibit 1      April 9, 2018 Offer Letter    24
 9                 (Brightstar-Miller)

10  Exhibit 2      Furlough Notification (March   50
                   24, 2020), BRIGHTSTAR
11                 000273-276

12  Exhibit 3      March 31, 2020 Pay Summary,    73
                   BRIGHTSTAR-000193-194
13
    Exhibit 4      Collective: Furlough           74
14                 Extensions, BRIGHTSTAR
                   000277-284; BRIGHTSTAR
15                 003963-966

16  Exhibit 5      December 11, 2020 Termination  76
                   Letter
17
    Exhibit 6      Amended Complaint             101
18                 (Brightstar-Miller)

19  Exhibit 7      Plaintiff's Discovery         111
                   Responses to Brightstar
20                 discovery

21

22

23

24

25
```

TYLER MILLER

Examination by Mr. Spero ......................5

EXHIBITS

Description Page

Exhibit 1    April 9, 2018 Offer Letter (Brightstar-Miller)    24

Exhibit 2    Furlough Notification (March 24, 2020), BRIGHTSTAR 000273-276    50

Exhibit 3    March 31, 2020 Pay Summary, BRIGHTSTAR-000193-194    73

Exhibit 4    Collective: Furlough Extensions, BRIGHTSTAR 000277-284; BRIGHTSTAR 003963-966    74

Exhibit 5    December 11, 2020 Termination Letter    76

Exhibit 6    Amended Complaint (Brightstar-Miller)    101

Exhibit 7    Plaintiff's Discovery Responses to Brightstar discovery    111

1    The videoconference deposition of

2    TYLER MILLER was taken on behalf of the Defendant

3    on December 22, 2020, at 12:56 p.m. for all

4    purposes under the Federal Rules of Civil

5    Procedure.

6        It is agreed that Terri Beckham,

7    being a Notary Public and Court Reporter for the

8    State of Tennessee, may swear the witness, and

9    that the reading and signing of the completed

10   deposition by the witness are waived.

11

12                    *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                P R O C E E D I N G S
 2                    TYLER MILLER
 3   was called as a witness, and after having been
 4   first duly sworn, testified as follows:
 5                THE REPORTER:  Will counsel please
 6   introduce yourselves, who you represent, and
 7   stipulate that it was okay for me, the court
 8   reporter, to swear the witness in via
 9   videoconference?
10                MR. SPERO:  This is Frankie Spero.
11   I'm the attorney for Brightstar Corp., the
12   defendant in this case, and yes, I stipulate to
13   the oath being administered in that manner.
14                MR. BULSO:  This is Gino Bulso and
15   Nicholas Bulso here on behalf of plaintiff.  And
16   we likewise stipulate to the witness being sworn
17   remotely.
18                MR. SPERO:  Ready to go?
19                THE REPORTER:  Ready to go.
20                MR. SPERO:  Okay.
21                    EXAMINATION
22   BY MR. SPERO:
23   Q.       Please state your full name.
24   A.       Tyler Gabe Miller.
25   Q.       Mr. Miller, my name is Frankie Spero.  I
```

                                                        5

```
 1    our stock option interests.
 2          And then I had an employment agreement
 3    with Asurion, both while there and upon exit.
 4    Q.      Can you explain the latter?  You said upon
 5    exit?
 6    A.      Yes.  That's a very, very lucrative
 7    business, and I entered into an agreement with
 8    them so I would not compete with them.
 9    Q.      Okay.  Did you participate in negotiating
10    those prior employment agreements with Asurion and
11    Ingrams?
12    A.      I did.
13    Q.      Is your wife employed?
14    A.      She is not.  A homemaker.  And a teacher,
15    home schoolteacher.
16    Q.      And you may have already answered this,
17    but do you own any -- currently own any
18    businesses?  Have ownership interest in any
19    businesses?
20    A.      Yes, real estate ventures.
21    Q.      Okay.  So you have ownership interest in
22    entities that own real estate?
23    A.      Correct.
24    Q.      You have an ownership interest in
25    Harvestar as well?
```

16

```
 1   A.       I do.

 2   Q.       Any other businesses that you have

 3   ownership interest in besides your real estate

 4   ventures and that company?

 5   A.       No, sir.

 6   Q.       What did you do for Asurion?

 7   A.       I was -- oh, boy, there's a -- that's a

 8   long answer.  But do you want my --

 9   Q.       What was your --

10   A.       -- latest role?

11   Q.       What was your -- what titles did you hold

12   at Asurion?

13   A.       My last title was chief supply chain

14   officer, which included operating responsibility

15   in Asia-Pacific.  So when I mentioned earlier that

16   we lived abroad for several years, that was

17   actually in Hong Kong.

18   Q.       Okay.  Did you hold prior positions with

19   Asurion as well?

20   A.       I did.  I was their chief procurement

21   officer, so I was responsible for all their

22   procurement activities in support of their

23   insurance business.

24            I was a director of operations.  I was a

25   VP of procurement.  I was a -- that's probably as
```

```
 1   have you ever been involved with any other
 2   litigation?
 3   A.        No, sir.
 4   Q.        Have you ever filed bankruptcy?
 5   A.        No, sir.
 6   Q.        Have you ever been a witness or a juror in
 7   a trial?
 8   A.        No, sir.
 9   Q.        Are you a part of any social or trade
10   organizations?
11   A.        No, sir.
12             Does church count?
13   Q.        Well, that's -- what church do you attend?
14   A.        Christ Pres.
15   Q.        Christ Pres.
16             So in April of 2018 you were hired by
17   Brightstar Corp.; is that correct?
18   A.        That is correct.
19   Q.        You became an employee of Brightstar
20   Corp.?
21   A.        That is correct.
22   Q.        And the position that you were hired to
23   was to be the general manager of Harvestar?
24   A.        That is correct.
25   Q.        And just so we're clear, which Harvestar
```

```
 1   entity were you hired to be the general manager
 2   of?
 3   A.      Harvestar Solutions, Hong Kong, Limited.
 4   Q.      Okay.  You were presented -- and
 5   Brightstar presented you with an employment offer
 6   letter, correct?
 7   A.      They did indeed.
 8   Q.      So I want to -- and I know you have it in
 9   front of you, but...
10           MR. SPERO:  Mr. Bulso, if you don't
11   mind, I think that should be the folder on top.
12   It says "Exhibit, April 9th, 2018, offer letter."
13   If you wouldn't mind passing that to Mr. Miller.
14           MR. BULSO:  The witness has it.
15           MR. SPERO:  Okay.  Thank you.
16   BY MR. SPERO:
17   Q.      Do you recognize the document in front of
18   you, Mr. Miller?
19   A.      I do.
20   Q.      Okay.  Is this the offer letter from
21   Brightstar Corp. to you dated April 9th, 2018?
22   A.      It is.
23   Q.      Okay.  And this document is signed by both
24   Brightstar Corp. and you, correct?
25   A.      It is.
```

```
 1   Q.        This is your employment agreement with

 2   Brightstar Corp., correct?

 3   A.        It is.

 4   Q.        Okay.

 5              MR. SPERO:  Terri, I want to mark

 6   that -- that'll be Exhibit 1 to the deposition.

 7              (Exhibit 1 marked.)

 8              MR. SPERO:  It's the --

 9              THE REPORTER:  Okay.  Got it.

10              MR. SPERO:  And I know I'll have to

11   send these to you, but that's the April 9, 2018

12   employment agreement.

13              THE REPORTER:  Okay.

14   BY MR. SPERO:

15   Q.        You participated in negotiating the terms

16   of this agreement, correct?

17   A.        That is correct.

18   Q.        Were you represented by counsel in your

19   negotiation of this agreement?

20   A.        That is -- yes.

21   Q.        Who was your counsel at that time?

22   A.        Rob Laird.

23   Q.        Is he an attorney in Nashville?

24   A.        He is.

25   Q.        And were there various versions of this
```

```
 1   A.        They weren't every day, but they were
 2   still three, four times a week up until the time
 3   the furlough notice came.
 4   Q.        Okay.  After June 2018, the time period
 5   we've been discussing, did you travel to Hong Kong
 6   or the Philippines on business for Harvestar after
 7   that point in time?
 8   A.        I did, yes.
 9   Q.        Okay.  What are the dates and reasons of
10   that travel?
11   A.        I would have to look up those dates, but I
12   would put on at least a quarterly visit in order
13   to review the financial performances, because
14   obviously as an equity holder I'm very interested
15   in the financial performance of the enterprise.
16   Q.        So was that travel in your capacity as a
17   equity holder in Harvestar or on behalf of
18   Brightstar?
19   A.        I don't know.
20   Q.        When you were making those quarterly
21   visits to -- to the Philippines?  Is that where
22   you were traveling?
23   A.        That is correct.
24   Q.        When you were making those quarterly
25   visits to the Philippines to visit Harvestar, were
```

```
 1   Q.       Your annual base salary under the
 2   employment agreement was 200,000 per year; is
 3   that...
 4   A.       That is correct.
 5   Q.       And under the employment agreement, you
 6   were offered comprehensive benefits package,
 7   including medical, dental, vision, short and
 8   long-term disability, and life insurance; is that
 9   correct?
10   A.       Correct.
11   Q.       Did you receive those employee benefits
12   during your time at Brightstar?
13   A.       No, not all of them.
14   Q.       Which ones did you receive?
15   A.       Health, dental, vision.  That would be it.
16   Q.       Okay.  Did you have the option to
17   participate in life insurance through the company?
18   A.       Yes.
19   Q.       But you chose not to?
20   A.       Correct.
21   Q.       What about 401(k)?  Did you participate in
22   the 401(k)?
23   A.       No.
24   Q.       But you had the option to?
25   A.       I did.
```

41

1   was deposited in the bank account.

2   Q.      Okay.  So you paid them as deductions from

3   your paycheck from Brightstar?

4   A.      Correct.

5   Q.      If you will look at the first paragraph

6   under "Termination of Employment."  It states

7   that, "Upon your termination of employment for any

8   reason, except as otherwise specifically provided

9   below, you shall have no further entitlement under

10  this offer letter to any compensation, including

11  but not limited to base salary and benefits."

12          And then it states some exceptions there,

13  a and b.

14          Did I read that correctly?

15  A.      You did.

16  Q.      Okay.  If you go down to the next

17  paragraph, the paragraph under that, the agreement

18  provides that if you are terminated without cause

19  or you resign with good reason, then you would

20  continue to receive your salary until the earlier

21  to occur of several enumerated events; is that

22  correct?

23  A.      That is correct.

24  Q.      Okay.  And are those events the three

25  numbered events that are set forth on the second

43

```
 1   page of the employment agreement?

 2   A.      Yes.

 3   Q.      Okay.  And those events on page 2 of the

 4   employment agreement, those are the four-year

 5   anniversary of the date hereof, that's number 1;

 6   number 2, the effective date that you are no

 7   longer a shareholder of Harvestar Solutions

 8   Limited or any successor thereto; or, number 3,

 9   the date that the company, which is Brightstar

10   Corp., releases you from your restrictive

11   covenants agreement, Section 6.7 of the share

12   purchase agreement; is that correct?

13                   MR. BULSO:  Object to the form.

14                   You may answer.

15                   THE WITNESS:  That's how it reads.

16   BY MR. SPERO:

17   Q.      Did I correctly state that those are the

18   events enumerated in the contract on page 2?

19   A.      (Pause)

20   Q.      You may answer.

21   A.      I believe you read it accurately.  I

22   wasn't following word for word, but certainly I

23   have no reason to suspect that you read it any

24   differently.

25   Q.      So under the employment agreement, if you
```

```
 1   you that's how the document reads.
 2   Q.      If you will turn over to page 3, your
 3   employment with Brightstar was at will, correct?
 4   A.      Correct.
 5   Q.      And the agreement provides -- I'm looking
 6   at the employment at will section.  Your
 7   employment with Brightstar Corp. was for no
 8   specific period of time, correct?
 9   A.      I don't understand your question.
10   Q.      The first sentence of that section, it
11   provides that your employment for Brightstar Corp.
12   was for no specific period of time.
13           Is that accurate?
14   A.      That's, in fact, how it reads.
15   Q.      Okay.  And the second sentence of that
16   section provides your employment for Brightstar
17   Corp. is on an at-will basis, meaning that either
18   you or the company may terminate your employment
19   any time, with or without advance notice, and for
20   any reason or no particular reason or cause.
21           Is that accurate?
22   A.      That is, in fact, how it reads.
23   Q.      And, again, you participated in the
24   negotiation of this agreement, correct?
25   A.      I did.
```

49

```
 1              MR. SPERO:  Mr. Bulso, would you pass
 2   Mr. Miller the next folder, it's entitled
 3   "Furlough Notification"?  If you don't mind.
 4              MR. BULSO:  The witness has the
 5   exhibit.
 6              MR. SPERO:  Thank you.
 7              Terri, I'd like to mark this as
 8   Exhibit 2.
 9              THE REPORTER:  Okay.
10              (Exhibit 2 marked.)
11   BY MR. SPERO:
12   Q.      Do you recognize this document,
13   Mr. Miller?
14   A.      I received it only in email form, yes.
15   Q.      This is the furlough notification that was
16   provided to you by Brightstar Corp. on March 24th
17   of 2020; is that correct?
18   A.      Yes.
19   Q.      Is this a accurate copy of that document
20   that was provided to you?
21   A.      Short of putting them side by side and
22   comparing exactly what was sent to me, which, of
23   course, I've not done, I'll take your word for it.
24   Q.      You received this furlough notification
25   from Brightstar Corp.?
```

50

```
 1   A.        Okay.  As they've defined it, certainly,
 2   yes.
 3   Q.        I'm asking, the notice says that your
 4   position at Brightstar Corp. is being placed on
 5   furlough, correct?
 6   A.        As they have defined it, yes.  Yeah.
 7   Q.        That's what the notice says?
 8   A.        Correct.
 9   Q.        Okay.  Do you have any reason to dispute
10   that you were, in fact, placed on furlough?
11   That's my question.
12   A.        By them.  I have no reason to --
13   Q.        Okay.  The next sentence of that,
14   Mr. Miller, it states, "Furloughs are a
15   company-initiated temporary unpaid leave of
16   absence."
17             Did I read that correctly?
18   A.        Okay, yes.
19   Q.        Okay.  So upon being placed on furlough,
20   you're saying you were no longer receiving your
21   salary, correct?
22   A.        That is correct.
23   Q.        The next paragraph -- going down to the
24   next paragraph -- so upon being placed on
25   furlough, did you continue receiving your medical,
```

```
 1   dental, vision benefits from Brightstar Corp.?

 2   A.      Yes.

 3   Q.      Okay.  Did you continue utilizing those

 4   benefits after being placed on furlough?

 5   A.      I did.

 6   Q.      Okay.  And upon being placed on -- and did

 7   you pay the premiums, or the portions due for

 8   those benefits, during your time on furlough?

 9   A.      I did not.

10   Q.      Is it your understanding those were paid

11   for by Brightstar Corp.?

12   A.      That would be my understanding.

13   Q.      Okay.  Now, upon being placed on furlough,

14   you continued to be an employee of Brightstar

15   Corp.; is that correct?

16              MR. BULSO:  Objection to the extent

17   it calls for a legal conclusion.

18   BY MR. SPERO:

19   Q.      You may answer.

20   A.      I don't know what you want to define an

21   employee as -- I don't -- as they would define an

22   employee?  I guess.

23   Q.      So -- okay.

24              MR. SPERO:  Terri, would you mind

25   reading back what I asked with that last question.
```

54

```
1   Q.      -- as to when -- through which date you
2   had been paid?
3   A.      Well, I mean, I have my bank statements,
4   but I don't know those dates off -- I know that
5   I've supplied them.
6   Q.      If you had your bank statements, would you
7   be able to say when -- through which date you had
8   been paid?
9   A.      I would be able to, yeah, if I had my bank
10  statements.
11  Q.      After you were placed on furlough by
12  Brightstar Corp., you no longer had access to
13  Brightstar's system; is that correct?
14  A.      That is correct.
15  Q.      Including the email -- the Brightstar
16  email system?  You no longer had access to that?
17  A.      That is correct.
18  Q.      And after being placed on furlough, you
19  performed no further work for Brightstar Corp.,
20  correct?
21  A.      That is correct.
22  Q.      And you've not performed any work from
23  furlough through the present time for Brightstar
24  Corp.?
25  A.      That's correct.
```

68

```
 1              You asked me a question earlier I want to
 2    correct.  You said, "Did you ever reach out to
 3    Brightstar?
 4              I did, in fact, reach out to -- I sent a
 5    text to Catherine Smith that stated something
 6    along the lines of, "This is directly opposed to
 7    my agreement, this furlough notice."
 8              She said, "I disagree."
 9              That was the end of our conversation, text
10    conversation.
11    Q.       Do you recall when that occurred, when
12    that communication occurred?
13    A.       It would be in and around these dates, but
14    specifics I don't have.
15    Q.       Okay.  What was communicated to you by
16    Catherine Smith?
17    A.       That "I disagree."
18    Q.       Did she say why?
19    A.       No.
20    Q.       At any point -- strike that.
21              At no point during the furlough period did
22    Brightstar ever tell you that your salary was
23    being changed.  Is that accurate?
24    A.       That is accurate.
25    Q.       And at no point during the furlough period
```

69

```
 1   those dates, which would be the release from your
 2   restrictive covenants agreement?
 3               MR. BULSO:  Objection, calls for a
 4   legal conclusion.
 5               THE WITNESS:  The agreement hadn't
 6   already been breached.
 7   BY MR. SPERO:
 8   Q.      I'm asking you:  Is that what the
 9   agreement says?
10   A.      And I'm saying that you are reading the
11   agreement accurately.
12   Q.      When is the four-year anniversary of this
13   employment agreement?
14   A.      Let me see.  April 9th, 2022.
15   Q.      And the date of the letter that you just
16   received from Brightstar Corp. is December 11th of
17   2020, correct?
18   A.      That is correct.
19   Q.      And December 11th is earlier in time to
20   April 9th of 2022, correct?
21   A.      Correct.
22   Q.      And the December 11th, 2020, letter states
23   in paragraph 2 that Brightstar Corp. is releasing
24   you from your restrictive covenant agreement and
25   Section 6.7 of the share purchase agreement
```

94

```
  1    documents.
  2    Q.       Okay.  So you're saying it has to be in a
  3    document for them to be -- for Brightstar to be
  4    able to furlough you?
  5    A.       As far as I'm concerned, "furlough" is a
  6    term that they've created.  I don't know what it
  7    means.
  8    Q.       After you were placed on furlough,
  9    Mr. Miller, your benefits, medical, health,
 10    vision, those benefits did not change, correct?
 11    They stayed the same?
 12    A.       No to my knowledge, they didn't change.
 13    Q.       Okay.  And they have remained the same
 14    throughout 2020 while you were on furlough?
 15    A.       To my knowledge, yes.
 16    Q.       (Pause)  If you'll just bear with me one
 17    second.
 18             If you'll look at paragraph 16 of your
 19    amended complaint.  The second sentence says,
 20    "Specifically, plaintiff is entitled to recover as
 21    damages from Brightstar the remaining salary owed
 22    under the agreement of $400,000, together with the
 23    economic value of the other benefits specified in
 24    the agreement."
 25             Did I read that correctly?
```

108

```
 1                    REPORTER'S CERTIFICATE
 2              I certify that the witness in the
 3    foregoing deposition, TYLER MILLER, was by me duly
 4    sworn to testify in the within entitled cause;
 5    that the said deposition was taken at the time and
 6    place therein named; that the testimony of said
 7    witness was reported by me, a Shorthand Reporter
 8    and Notary Public of the State of Tennessee
 9    authorized to administer oaths and affirmations,
10    and said testimony, pages 1 through 130, was
11    thereafter transcribed to typewriting.
12              I further certify that I am not of
13    counsel or attorney for either or any of the
14    parties to said deposition, nor in any way
15    interested in the outcome of the cause named in
16    said deposition.
17              IN WITNESS WHEREOF, I have hereunto
18    set my hand on December 28, 2020.
19
20
21
22         Terri Beckham, RPR, RMR, CRR, LCR No. 355
23         My commission expires:  3/6/2022
24
25
```

131