# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| TYLER MILLER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 3:20-cv-00313 ) |
| BRIGHTSTAR INTERNATIONAL CORP. d/b/a BRIGHTSTAR CORP, | ) ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

Faced with uncertainty during the early months of the global coronavirus pandemic, many companies, including Defendant BrightStar International Corporation d/b/a BrightStar Corp. ("Brightstar"), placed their employees on temporary unpaid leaves of absence (i.e. furloughs). But the problem with Brightstar's approach is that some of its employees, including Plaintiff Tyler Miller, had employment agreements that guaranteed them a set salary. And when Brightstar refused to pay Miller's salary during the company-initiated furlough period, Miller filed this action alleging that Brightstar breached its employment agreement. Now before the Court are cross-motions for summary judgment on Miller's breach of contract claim (Doc. Nos. 41, 56), which have been fully briefed and are ripe for review (see Doc. Nos. 44, 47, 50, 59, 64, 70). For the following reasons, Miller's motion will be granted and Brightstar's motion will be denied.

## I. BACKGROUND AND UNDISPUTED FACTS[1]

On April 9, 2018, Brightstar's subsidiary acquired a majority stock interest in Miller's former company, Harvestar Solutions Limited ("Harvestar"). (Doc. No. 23 ¶ 7). In connection with

---

[1] The undisputed facts in this section are drawn from the undisputed portions of the parties' statements of facts (Doc. Nos. 48, 51, 65), the exhibits and depositions submitted in connection

that acquisition, Brightstar simultaneously sent Miller a proposed employment agreement (hereinafter "Employment Agreement") offering him the position of "General Manager, Harvestar." (Doc. No. 23-1; see also Doc. No. 51 at ¶ 1). The Employment Agreement set forth the terms and conditions of Miller's employment, stated that he would be employed by Brightstar on an "at will" basis, and provided that his "annual base salary will be $200,000, and will be paid in accordance with the Company's normal payroll procedures." (Doc. No. 23-1 at 1, 3; see also Doc. Nos. 48 at ¶¶ 1–3; 51 at ¶ 2). It also stated that "your title [and] compensation . . . may only be changed with your written consent." (Doc. No. 23-1 at 3).

Under the subheading "Termination of Employment," the Employment Agreement further provided that:

> Upon your termination of employment for any reason, except as otherwise specifically provided below, you shall have no further entitlement under this offer letter to any compensation, including but not limited to base salary and benefits, except (a) base salary that is accrued and unpaid as of your termination of employment, and (b) any vested accrued benefits to which you are entitled pursuant to the Company's benefit plans. . . .
>
> In the event you are terminated without Cause or resign with Good Reason (as both terms are defined below),[2] you shall continue to receive your salary until the earlier to occur of:
>
> 1) the four (4) year anniversary of the date hereof;
>
> 2) the effective date that you are no longer a shareholder of Harvestar Solutions Limited (or any successor thereto); or
>
> 3) the date the Company agrees, in writing, to release you from the Restrictive Covenants Agreement, entered into between you and the Company as of April 9,

---

with the summary judgment briefing, and portions of the Amended Complaint (Doc. No. 23) that are not contradicted by the evidence in the record.

[2] The Employment Agreement provides detailed definitions of "Cause" and "Good Reason" (see Doc. No. 1-2 at 2), but those definitions are not relevant for purposes of ruling on the instant motions for summary judgment.

2

2018, and the provisions of Section 6.7 of the Share Purchase Agreement dated April 9, 2018.

(Id. at 1–2). Miller signed the Employment Agreement, which became effective on April 10, 2018, and Brightstar began paying his salary semi-monthly. (Doc. No. 48 ¶ 5).

On March 24, 2020, Brightstar sent Miller a letter captioned "URGENT PLEASE READ: Furlough Notification," stating that "due to the coronavirus emergency and related business circumstances, your current position at Brightstar . . . is being placed on furlough effective . . . March 25, 2020[.]" (Doc. No. 23-2; see also Doc. No. 51 at ¶ 4). The letter defined "furlough" as "a company-initiated temporary unpaid leave of absence." (Doc. No. 23-2 at 1). Although Miller did not perform any work for Brightstar after March 25, 2020, he continued receiving his full medical, dental, and vision benefits during the furlough period. (Doc. Nos. 48 at ¶ 8; 65 at ¶¶ 8–9). However, Brightstar did not pay Miller any salary after March 27, 2020. (Doc. No. 65 ¶ 9).

On December 11, 2020, BrightStar sent Miller a termination letter informing him that he was being terminated "without Cause" under the Employment Agreement, and he was no longer entitled to receive any further compensation, salary, or benefits from Brightstar. (Doc. No. 57-3 at 2). The termination letter further stated that, as of December 11, 2020, Brightstar "hereby agrees to and does release you . . . from the Restrictive Covenants Agreement, entered into by and between you and [Brightstar] as of April 9, 2018, and from the provisions of Section 6.7 of the Share Purchase Agreement, dated April 9, 2018[.]" (Id.).

After receiving the furlough notification but before receiving the termination letter, Miller filed this breach of contract action against Brightstar, asserting that "Brightstar's failure to continue to pay [him] the annual $200,000 salary for which he bargained as part of his sale of a controlling interest in Harvestar is a material breach of the [Employment] Agreement." (Doc. No. 23 ¶ 15). Both parties have now moved for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and internal quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). "And where, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" McKay v. Federspiel, 823 F.3d 862, 866 (6th Cir. 2016) (quoting Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the

4

non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

## III. ANALYSIS

The Court will analyze Miller's breach of contract claim under Florida law because the Employment Agreement is "governed and construed in accordance with the laws of the state of Florida." (Doc. No. 23-1 at 3). In Florida, "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999) (citing Abruzzo v. Haller, 603 So.2d 1338, 1340 (Fla. Dist. Ct. App. 1992)). Because there is no dispute that the Employment Agreement was a valid contract, the only remaining issues in this case are whether Brightstar materially breached the Employment Agreement by not paying Miller his salary during the furlough period, and, if so, whether and to what extent Miller was damaged by the breach. The Court will address both issues below.

### A. Material Breach of the Employment Agreement

To determine whether a breach of contract occurred under Florida law, "the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." Energy Smart Indus., LLC v. Morning Views Hotels-Beverly Hills, LLC, 660 F. App'x 859, 862–63 (11th Cir. 2016) (quoting Rose v. M/V "Gulf Stream Falcon", 186 F.3d 1345, 1350 (11th Cir. 1999)). Here, in exchange for acquiring a majority share in Harvestar, Brightstar negotiated the Employment Agreement with Miller and agreed to pay him $200,000 a year "in accordance with the Company's normal payroll procedures." (Doc. No. 23-1). Pursuant to the language of this valid contract, Brightstar was obligated to pay Miller his full salary unless: (1) Miller consented in writing to be compensated less; (2) Miller was terminated with "Cause" or resigned without "Good Reason," or (3) Miller was terminated without "Cause" or resigned with

5

"Good Reason" and one of the three triggering events occurred. (See id.). But given that none of these enumerated situations applied (at least not until Miller's termination on December 11, 2020), and given that the Employment Agreement does not contain a force majeure clause or any other provision that allows Brightstar to withhold Miller's guaranteed salary during a company-initiated furlough, Brightstar materially breached the Employment Agreement when it stopped paying Miller's salary after March 27, 2020. (Doc. Nos. 48 at ¶¶ 8, 10; 51 at ¶ 13; 65 at ¶ 7).

Brightstar urges the Court not to reach this conclusion for several reasons, none of which are convincing. For example, Brightstar argues that Miller is not entitled to relief because his exclusive remedy under the Employment Agreement was to show that he was terminated without Cause or resigned with Good Reason, and he failed to do so. (Doc. No. 47 at 5–7). But this argument reflects a misreading of the Employment Agreement's plain language, which provides that "[i]n the event you are terminated without Cause or resign with Good Reason . . . , you shall continue to receive your salary until" one of three triggering events occur. (Doc. No. 23-1 at 1). It is unambiguous that this provision applies only if Brightstar terminated Miller or he resigned, and it is undisputed that Miller remained a Brightstar employee until December 11, 2020. (See Doc. No. 50 at 3–4). Thus, the Court finds that the Employment Agreement's termination provision (and the proof required to show "Cause" or "Good Reason") is irrelevant to Miller's claim that Brightstar materially breached the Employment Agreement by not paying his agreed-upon salary while he was still an employee.

The Court also disagrees with Brightstar's contention that it did not "change" Miller's salary when it stopped paying him during the furlough period. (Doc. No. 47 at 7–8). Again, the Employment Agreement unambiguously states that Miller's "annual base salary will be $200,000, and will be paid in accordance with the Company's normal payroll procedures," which the parties

6

Case 3:20-cv-00313   Document 79   Filed 06/01/21   Page 6 of 9 PageID #: 930

agree means semi-monthly. (Doc. Nos. 23-1 at 1; 48 at ¶ 4). It also states that Miller's compensation "may only be changed with [his] written consent." (Doc. No. 23-1 at 3). Given this contractual language, it is unclear how Brightstar can argue in good faith that Miller's $200,000 salary remained the same when he was not paid for months. In fact, Brightstar's zealous advocacy on this issue could be a problem under Federal Rule of Civil Procedure 11.

Last, Brightstar argues that, under the Fair Labor Standards Act ("FLSA"), Miller is not entitled to any salary during the furlough period because he did not perform any work during that time. (Doc. No. 47 at 7–8). However, this is a breach of contract case, not a FLSA case, and whether Miller is entitled to relief under the FLSA is not at issue here. Unlike in the FLSA, there is nothing in the Employment Agreement that required Miller to perform work to receive his salary. Of course, if Miller refused to work under normal circumstances, Brightstar's recourse would be to terminate him for "Cause" and stop paying his salary. (See Doc. No. 23-1 at 2 (noting that "'Cause' means," among other things, "your failure to perform duties to the Company")). But that is not what happened here. Instead, Brightstar violated the Employment Agreement by not paying Miller's salary while he remained an employee.

Accordingly, the Court finds that there are no genuine disputes of material fact and that Brightstar is liable for breach of the Employment Agreement as a matter of law.

B. Damages for Breach of the Employment Agreement

Having determined that Brightstar is liable to Miller for breach of the Employment Agreement, the Court now turns to the issue of damages.

As an initial matter, the Court disagrees with Miller's argument that Brightstar's anticipatory repudiation of the Employment Agreement entitles him to his salary through April 9, 2022, the four-year anniversary of his employment offer. (See Doc. No. 64 at 19–22). The plain language of the Employment Agreement states, in relevant part, that "[i]n the event you are

7

terminated without Cause . . . you shall continue to receive your salary *until the earlier to occur of*: 1) the four (4) year anniversary of the date hereof; . . . *or* 3) the date the Company agrees, in writing, to release you from the Restrictive Covenants Agreement . . . and the provisions of Section 6.7 of the Share Purchase Agreement[.]" (Doc. No. 23-1 at 2–3 (emphasis added)). Nothing in this language guarantees that Miller would receive his salary for four years. Instead, Miller *could* receive his salary after he was terminated up to April 9, 2022, so long as none of the other triggering events occurred. And here, the "earlier to occur" event after Miller was terminated "without Cause" was Brightstar's written agreement to release Miller from the specified Restrictive Covenants Agreement and Section 6.7 of the Share Purchase Agreement on December 11, 2020. (Doc. No. 57-3 at 1). Accordingly, Miller was not entitled to receive any further compensation from Brightstar under the Employment Agreement after December 11, 2020.

Nor is Miller entitled to "the economic value of the other benefits specified in the [Employment] Agreement." (See Doc. No. 23 ¶ 16). It is undisputed that Miller continued receiving his full medical, health, and vision benefits until December 11, 2020. (Doc. No. 65 at ¶ 8). And after Miller's termination on December 11, 2020, he was no longer entitled to any further benefits from Brightstar. Thus, Miller never suffered any damages to his benefits under the Employment Agreement.

On the other hand, Miller is entitled to recover the $200,000 annual salary he is owed under the Employment Agreement for the period between March 28, 2020 (the first day he did not receive his salary) and December 11, 2020 (the day he was terminated). The Court takes judicial notice that there were 258 days between March 28, 2020 and December 11, 2020, and that Miller would receive roughly $547.95 each day of the year if he was paid his $200,000 annual salary. After

8

multiplying 258 by $547.95, the Court concludes that Miller is entitled to recover $141,369.86 in compensatory damages for Brightside's breach of the Employment Agreement.

## IV. CONCLUSION

For the foregoing reasons, Miller's Motion for Summary Judgment (Doc. No. 41) will be granted and Brightstar's Motion for Summary Judgment (Doc. No. 56) will be denied. Miller is entitled to damages in the amount of $141,369.86. The Court will reserve decision on whether Miller is also entitled to an award of attorneys' fees, costs, expenses, and prejudgment interest until presented with a separate motion. See Fed. R. Civ. P. 54; M.D. Tenn. L.R. 54.01.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE